UNITED STATES of America,
Plaintiff–Appellee,

v.

TRAN TRONG CUONG, M.D.,
Defendant–Appellant.

No. 93–5308.

United States Court of Appeals,
Fourth Circuit.

Argued Oct. 28, 1993.

Decided Feb. 28, 1994.

**ARGUED:** Cary Steven Greenberg, Alexandria, Virginia; Edward Scott Rosenthal, Rosenthal, Rich, Grimaldi & Guggenheim, Alexandria, Virginia, for appellant. Vincent L. Gambale, Assistant United States Attorney, Alexandria, Virginia, for appellee.

**ON BRIEF:** Kenneth E. Melson, United States Attorney, W. Neil Hammerstrom, Jr., Assistant United States Attorney, David G. Barger, Assistant United States Attorney, Alexandria, Virginia, for appellee.

Before HAMILTON, Circuit Judge, CHAPMAN, Senior Circuit Judge, and KAUFMAN, Senior United States District Judge for the District of Maryland, sitting by designation.

## OPINION

CHAPMAN, Senior Circuit Judge:

Appellant Tran Trong Cuong, M.D. (Tran) is a physician educated in Paris, France and admitted to practice medicine in the Commonwealth of Virginia since 1973. He is registered as a practitioner with the Drug Enforcement Administration and authorized to prescribe controlled substances listed in Schedules II, III, IV and V as set forth in 21 U.S.C. § 812.[1] He was indicted under 21 U.S.C. § 841(a)(1) for knowingly and willfully distributing and dispensing by prescription various quantities of Schedule II through V controlled substances outside the usual course of medical practice and for other than legitimate medical purposes. The indictment contained 136 counts of unlawful distribution of the drugs and a separate count for criminal forfeiture of property allegedly used in connection with these offenses, as provided by 21 U.S.C. § 853. Following a jury trial, Tran was convicted of 127 counts, and the jury returned a special verdict supporting forfeiture of certain real estate located in Alexandria, Virginia. He was acquitted of eight counts, and one count was dismissed prior to the verdict.

Tran was sentenced to 97 months in prison, ordered to pay a special assessment of $6,350, and an order of forfeiture was entered as to the real estate. Tran now appeals. This appeal presents a number of issues: (1) sufficiency of the evidence, particularly as to the 80 counts as to which there was no testimony from the patient receiving

1. Drugs are ranked in these schedules according to their potential for abuse. Schedule I substances are strictly illegal. Schedule II substances have a high abuse potential leading to severe psychological or physical dependence but are currently accepted in some medical applications and can safely be used when a patient is under medical supervision. Schedule III substances have less potential for abuse leading only to moderate or low physical dependence or high

psychological dependence, and are currently accepted for use in medical treatment. Schedule IV substances are currently accepted in medical application and have a comparatively low abuse risk with a potential for only limited physical or psychological dependence. Schedule V substances have an even lower potential for risk abuse and only a limited potential for physical or psychological dependence.

the prescription; (2) reputation evidence presented by the government although Tran had not placed his reputation at issue nor presented any evidence tending to prove his good reputation; (3) the government's medical expert's effort to bolster his opinion with that of another physician, who did not testify; (4) the proper standard to use in determining whether a prescription violated 21 U.S.C. § 841(a)(1), and (5) various questions as to the sentence.

We reverse and remand for a new trial because of the introduction of evidence as to Tran's reputation and the use of Dr. Stevenson's opinion to support the medical opinion of Dr. Alan MacIntosh, when Dr. Stevenson's opinion was hearsay and he was not available for cross-examination. We also reverse the convictions under Counts 1–8, 25–64, 69–84, 93–96 and 101–112 because we find the evidence insufficient to convict. We do not reach the sentencing questions, because the convictions are all reversed and the convictions set aside. The order of forfeiture is reversed and the case is remanded for further proceedings.

## I.

Tran is accused of unlawfully prescribing controlled substances to a total of 30 patients between April 1989 and January 1992. The indictment charges that 1,711 prescriptions were written to these 30 individuals during the time alleged in the indictment and these prescriptions included drugs such as Percodan from Schedule II, Vicodin and Tylenol with codeine from Schedule III, and Valium and Zanax from Schedule IV. The testimony showed that approximately 4,000 of Tran's prescriptions were filled during 1991 at 35 pharmacies close to his office. A pharmacist testified that he had called Tran in February 1990 about one of his patients who was getting controlled substances from other doctors, and William Jennings, an inspector from the Virginia Department of Health professions testified that he had warned Tran that Tran was "being conned" into prescribing narcotics to patients who were known drug abusers.

The government presented seven former patients, who testified that Tran's physical examinations had been perfunctory, that they faked their symptoms of pain and illness in order to obtain prescriptions to feed their addictions, that Tran frequently reminded them that he could not give them medication unless they told him they were in pain, and that Tran suggested that they fill the prescriptions at different pharmacies. Some of the witnesses asked for drugs by name, and one testified that he received prescriptions in return for doing repair work at Tran's office. Several witnesses testified that they were asked to sign written release forms acknowledging the addictive potential and dangers of the drugs that were being prescribed.

The DEA obtained a search warrant for the doctor's office and obtained patient files and the office cash payment ledger. From these records it appeared that Tran charged $35 for issuing the desired prescriptions and the patient files reflected that he kept many patients on narcotics and tranquilizers for years when their complaints were for headaches, backaches and other subjective ailments.

Most of the prescriptions were not refillable and this required the patients to come back to the doctor each time they wanted a refill and obtain a new prescription and pay his $35 fee. There was testimony that he advised patients that they needed to have different complaints of pain in different parts of the body because it would look bad if they were taking these drugs for ailments that persisted too long.

Two undercover Alexandria police officers testified that they went to the doctor's office without an appointment to seek narcotic "scripts," the street name for narcotics prescriptions. Tran saw one of these undercover agents eight times over two months in early 1991, spent no more than five minutes with him on each visit and prescribed controlled substances on each visit. These officers testified that the doctor did not perform any medical examinations of them and that one advised him "I'd like to feel a little mellowed out."

One of these officers dressed very shabbily and poured Bourbon whiskey over his clothes. He testified that he told Tran he

was in need of Percodan to get through the winter as a construction laborer. Tran refused to prescribe Percodan, a Schedule II drug, but did give him a prescription for Vicodin, a Schedule III drug.

The government called a medical expert, Dr. Alan MacIntosh, a Board certified family physician who had practiced for 32 years. He had reviewed 33 charts of patients listed in the indictment and prepared a written report summarizing the information on each chart. He prepared an exhibit which correlated 1800 narcotics prescriptions with specific patients. He had reviewed the grand jury testimony of some of the patients as well as the DEA undercover reports. He had also examined the waivers or releases that Tran had required some patients to sign. He gave his opinion that after a few days the continued use of narcotics for most of the complaints shown in the files would do no medical good and would possibly be harmful because such drugs would lead to addiction, and that these prescriptions were totally unreasonable and not appropriate care for a family physician. Dr. MacIntosh also testified as to the qualifications of Dr. Stevenson who had also prepared a report on some of Dr. Tran's patients. It was Dr. MacIntosh's opinion that his findings and Dr. Stevenson's findings were "essentially the same." This testimony came in over the objection of defense counsel.

Tran called two physicians, one an oncologist and the other a psychiatrist, who was a pain clinic director. One testified that his general impression of the defendant's patient charts showed a pattern of practice that was within the state of the art and the other testified that the defendant's prescriptions were within the medical standard and were conservative because Tran prescribed only small amounts of medication on each prescription. Neither of these witnesses had ever seen a release or waiver form such as that required by Tran. They also stated that they had never advised patients to use different pharmacies or to use pharmacies without computers to conceal the volume of prescriptions being written.

Tran also called two of his patients, Hanson and Coats. Coats testified that she was an addict and went to the defendant in 1984 to get drugs. She did not tell him of her addiction but claimed a back problem. On cross examination, she related that between 1984 and October 1991 she obtained prescriptions from Tran every week or two and from January 1990 to October 1991 she received 145 narcotics prescriptions from him. In cross examining Coats, the Assistant United States attorney asked "Is it fair to say that Dr. Tran had a reputation in the community for being an easy source of drugs?" Defense counsel objected and moved to strike the question, but the court stated, "It goes to character." The court then asked, "Do you know whether he had a reputation or not?" The witness answered that Tran had a reputation for being an easy source of drugs. The defendant unsuccessfully moved for a mistrial.

Of the counts in the indictment, 80 related to 20 patients who did not appear or testify at the trial. There were four prescriptions as to each of these 20 patients and each prescription, a total of 80, was a separate count in the indictment. The evidence supporting these counts was the testimony of Dr. MacIntosh, supported by his exhibit, which was a summary of the files covering these patients and the prescriptions written for them by Tran.

## II.

■ The language of Federal Rule of Evidence 404(a) is clear and concise. It provides: "Evidence of a person's character or a trait of his character is not admissible for the purpose of proving action in conformity therewith on a particular occasion." This rule is a codification of the well-known statement by Justice Jackson in *Michelson v. United States*:

> Not that the law invests the defendant with a presumption of good character; ... it simply closes the whole matter of character, disposition and reputation on the prosecution's case-in-chief....
>
> But this line of inquiry firmly denied to the State is opened to the defendant because character is relevant in resolving probabilities of guilt.... The price a de-

fendant must pay for attempting to prove his good name is to throw open the entire subject which the law has kept closed for his benefit and to make himself vulnerable where the law otherwise shields him. The prosecution may pursue the inquiry with contradictory witnesses to show that damaging rumors, whether or not well-grounded, were afloat—for it is not the man that he is, but the name that he has which is put in issue.

335 U.S. 469, 475–479, 69 S.Ct. 213, 218–220, 93 L.Ed. 168 (1948) (citation and footnotes omitted).

In the present case, appellant had not placed his character or reputation in evidence, but the trial judge allowed the prosecution in the cross-examination of defense witness Coats to ask, "Is it fair to say that Dr. Tran had a reputation in the community for being an easy source of drugs?" An immediate objection was noted by defense counsel together with a motion to strike, but the court appeared to momentarily forget the intent and meaning of Rule 404(a) and overruled the objection, stating, "It goes to character." This is the very purpose the rule forbids. The error was compounded by the court's question "Do you know whether he had a reputation or not?" Witness Coats answered that Tran had a reputation for being an easy source of drugs, which is the answer the prosecution obviously wanted. The government now admits that this question and answer were not admissible under Federal Rule of Evidence 404(a) but claims that it was admissible under 404(b) as evidence of other crimes, wrongs or acts. Federal Rule of Evidence 404(b) provides:

> Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident....

The government's position is disingenuous and lacking in merit. Witness Coats was not testifying as to other "crimes, wrongs or acts". She was testifying as to acts covered by the indictment, and the court did not admit this evidence as other acts, but as evidence of the defendant's reputation and character, the one area it could not enter unless the defendant first opened the door, which the defendant had not done. We have held that a strong and immediate curative instruction may sometimes dissipate the prejudice from the inadvertent admission of character evidence, but here the admission was not inadvertent. The evidence was admitted because "it goes to character," and since the court did not realize that it had committed error, no curative instruction was given. *See United States v. Johnson*, 610 F.2d 194, 196 (4th Cir.1979), *cert. denied*, 446 U.S. 911, 100 S.Ct. 1840, 64 L.Ed.2d 264 (1980).

■ In *United States v. Harris*, 331 F.2d 185 (4th Cir.1964), the defendant was convicted of concealing 150 gallons of non-tax paid whiskey. Harris operated a business known as the Ponderosa which sold canned goods, sandwiches and soft drinks. The alleged offense did not occur at the Ponderosa, but the government, over objection, was permitted to cross examine the defendant as to the reputation of the Ponderosa being "bad for liquor." The government was also permitted to present testimony, over defendant's objection, as to his reputation for violating the liquor laws. The government argued that since the defendant had testified that he had twice been convicted of dealing in non-tax paid whiskey, his reputation was a proper subject for inquiry. We rejected this argument. In reversing the conviction, we reiterated the rule that when a defendant testifies as a witness in his own behalf, his general reputation as to truth and veracity in the community may be shown, but the defendant's general character may not be attacked by the government unless evidence of his good character is first introduced by the defendant. We concluded: "It was substantial error to permit the Government to attack defendant's character by introducing testimony concerning his reputation as a 'liquor law violator on a large scale.'" *Id.* at 188. The same reasoning applies to the present case. Tran had not placed his character or reputation in evidence and the violation of this well-established rule clearly prejudiced the defen-

dant's right to a fair trial, and his convictions must be reversed.

### III.

Tran argues that the evidence was insufficient to convict him of any offense, and that this insufficiency was most apparent as to the 80 counts in which the patients, who had received four prescriptions each, did not testify. As to these counts, he claims that there is no proof of his criminal intent in issuing the prescriptions, nor was there proof that his actions "exceeded the bounds of 'professional practice'" as required by *United States v. Moore,* 423 U.S. 122, 142, 96 S.Ct. 335, 345, 46 L.Ed.2d 333 (1975) (footnote omitted).

### A.

First, we must consider what proof is required in the prosecution of a physician under this statute. Section 841(a) of Title 21 of the United States Code provides, in part: "(a) ... it shall be unlawful for any person knowingly or intentionally—(1) to ... distribute, ... a controlled substance...." In order to secure a conviction under this section the government must prove beyond a reasonable doubt that (1) defendant knowingly or intentionally distributed the controlled substance alleged in the indictment, and (2) at the time of such distribution the defendant knew that the substance distributed was a controlled substance under the law. There is no dispute that the prescriptions written by Tran were drugs that appear on Schedules II through V of the Controlled Substances Act, 21 U.S.C. § 801 et seq., and therefore are "controlled substances" and may not be lawfully distributed other than as provided by law.

■ Tran is a licensed physician under the laws of Virginia, and a licensed practitioner with the Drug Enforcement Administration. As such, he is authorized to write prescriptions for controlled substances in the care and treatment of his patients. The court in *Moore, supra,* held, "[T]he scheme of the statute, viewed against the background of the legislative history, reveals an intent to limit a registered physician's dispensing authority to the course of his 'professional practice.'" 423 U.S. at 140, 96 S.Ct. at 344. Therefore, a licensed physician who prescribes controlled substances outside the bounds of his professional medical practice is subject to prosecution and is no different than "a large-scale 'pusher.'" *Id.* at 143, 96 S.Ct. at 345.

### B.

■ First, Tran contends that the court and the prosecution used a medical malpractice standard rather than a criminal standard to judge his actions. At times the court did confuse the two standards. When Dr. MacIntosh was testifying, the court advised him, "The standard is whether a reasonably prudent physician would do it." Later the court commented, "whether it is within the standard of care of a family practitioner" and "like you use in a civil case, whether in the usual course of treating a patient by the average family practitioner...." These statements reflect the use of a negligence standard. A criminal prosecution requires more—that is, proof beyond a reasonable doubt that the doctor was acting outside the bounds of professional medical practice, as his authority to prescribe controlled substances was being used not for treatment of a patient, but for the purpose of assisting another in the maintenance of a drug habit or of dispensing controlled substances for other than a legitimate medical purpose, i.e. the personal profit of the physician.

The record discloses that the court's definition of the criminal standard was correct when he instructed the jury at the conclusion of the case. In explaining the essential elements of the case, he charged:

> The third element, no legitimate medical purpose. The final element the government must prove beyond a reasonable doubt is that the defendant prescribed the drug other than for legitimate medical purpose and not in the usual course of medical practice.
>
> In making a medical judgment concerning the right to treatment for an individual patient physicians have discretion to choose among the wide range of available options. Therefore, in determining whether defendant acted without a legitimate

medical purpose, you should examine all the defendant's actions and the circumstances surrounding them.

For example, evidence that a doctor warns his patients to fill their prescription at different drug stores, prescribes drugs without performing any physical examinations or only very superficial ones, or ask [sic] patients about the amount or type of drugs they want, may suggest that the doctor is not acting for a legitimate medical purpose than a [sic][2] outside the usual course of medical practice. These examples are neither conclusive nor exhaustive. They are simply meant to give you an idea of the kind of behavior from which you may conclude that a doctor was not prescribing drugs for a legitimate medical purpose and was not acting in the usual course of medical practice.

A doctor dispenses a drug in good faith in medically treating a patient, then the doctor has dispensed the drug for a legitimate medical purpose in the usual course of medical practice. That is, he has dispensed the drug lawfully. Good faith in this context means good intentions in the honest exercise of best professional judgment as to a patient's need. It means the doctor acted in accordance with what he believed to be proper medical practice.

If you find the defendant acted in good faith in dispensing the drug, then you must find him not guilty.

The instructions given the jury include a satisfactory definition of the actions of a physician which are outside the course of professional medical practice. The standard used by the court "without a legitimate medical purpose" does appear to be more strict than that required by *Moore* and therefore was to defendant's benefit.

## C.

■ Having decided that the jury was properly instructed as to the correct medical standard for this criminal prosecution, we turn to the evidence. Although the court told Dr. MacIntosh to use a negligence or malpractice standard, an examination of his testimony and the other evidence presented convinces us that Dr. Tran's actions in dispensing narcotics and other controlled substances violated the criminal standard and were outside the bounds of his professional medical practice. Dr. MacIntosh has practiced family medicine for 32 years and is Board certified in this discipline. He testified that he had examined 33 charts of patients listed in the indictment and prepared a written report summarizing the information on each chart. This is government exhibit 34. He also prepared an exhibit that correlated 1,800 narcotic prescriptions to specific patients and he read the grand jury testimony of a number of patients. He also reviewed the DEA undercover reports and pertinent medical literature and examined the patient waivers or releases that were in the files found in the defendant's office. He also reviewed the opinions of Dr. Stevenson as to the same patient charts.[3]

Dr. MacIntosh also explained the appropriate medical regime for treating patients complaining of pain and nervousness, which were the ailments most prevalent in Tran's patients' records and for which the drugs were prescribed. MacIntosh explained that a physician should take a complete personal and family medical history, undertake a modified physical examination including blood pressure, pulse, heart and lung examination and examination of the area directly referred to by the patient as causing pain. He must then decide whether to proceed further with the examination or to refer the patient for x-rays, blood tests and more sophisticated procedures. He should also examine the patient's experience with various medication. It is Dr. MacIntosh's opinion that a prescription for controlled substances is not required for moderate pain. For severe pain, such drugs might be prescribed for a few days, and if this does not provide relief, the physician must consider more sophisticated diagnostic procedures. He noted, "But after the first few days, the continued use of narcotics would be not only not good medical practice, it might even be harmful, because you could

---

**2.** The judge either misspoke or the court reporter erred. "Than a" should probably read "and is."

**3.** We address this issue in part V of this opinion.

lead the person into an addictive process." The doctor testified that he found almost every chart contained evidence of bad and harmful medical practice because of the prescription for narcotics "on a weekly or biweekly basis for many years" and that persons claiming such severe pain over a long period of time should have had additional reports in their files of x-ray examinations, blood tests and other procedures attempting to identify the source of the pain. He also stated he could find no justification for prescribing a narcotic for mechanical type pain, like a headache or a tooth ache, for more than a few days.

He also testified:

[T]he weekly prescriptions of tranquilizers and narcotics for what are essentially nonmalignant and serious disease-entities, as proven by the fact that weeks and months would go by and the patient hadn't changed in any way, are totally unreasonable and are not the appropriate care in family practice.

The abiding feature of primary care is that you avoid the prescriptions of addicting drugs for any period of time. You do it essentially for brief periods to tide people over a severe pain which is fully expected to recede and will respond to lesser drugs. And the continued prescribing week after week of a narcotic or tranquilizer does harm to the patient's overall health, and is not the standard of care for a family physician.

The doctor also found that Tran's files contained notes written in different colored ink which he felt was unusual and evidence that the entries were not contemporaneous with the treatment. He also testified that the release or waiver forms Tran obtained from certain of his patients who were taking narcotics was not like any practice he had observed by other physicians over the years.

The use of the patient release forms, we believe, was evidence that Tran knew he was doing something outside the professional practice, but nevertheless tried to protect himself.

The prosecution presented the testimony of three undercover agents, who went to Tran's office as a part of the investigation. They were: Mark Sanders, an inmate serving a state sentence for drug prescription fraud; and John Zook and Jim Milito, Alexandria police officers whose visits to Tran were recorded. Also testifying were seven persons who had obtained various Schedule II, III and IV drugs from Tran at his office over a period of years. These witnesses were Ronald Proffitt, Frances Collier, Michael Collier, Emily Burns, Carol Via, Susan Prior and Donald Richmond.

The testimony of these witnesses together with that of the government's expert was sufficient to prove the essential elements of the charges against Tran as contained in Counts 9–24, 85–93, 97–100, and 113–135. This evidence clearly established that the defendant was prescribing controlled substances outside his professional medical practice. The record reflects that in most cases the patients complained of such nebulous things as headaches, neckaches, backaches and nervousness, conditions that normally do not require the prescription of controlled substances initially, and certainly not over a period extending for many months and in some cases for years. Tran was also aware that some of these patients were obtaining the same drugs from other doctors. Most of the patients were given very superficial physical examinations and even after months of the same complaints of pain and the same prescriptions of drugs, they were not given more complete examinations, nor were they subjected to x-rays or blood analysis or referred to specialists in an effort to identify and correct the cause of the pain.

A number of the patients were obviously addicted to narcotics or other drugs when they came to Tran or they became addicted as a result of his continuing to prescribe drugs for them. Susan Prior and Donald Richmond were hospitalized because of their addiction. Several years after Prior was released from hospitalization, she returned to Tran and he immediately began to prescribe drugs for her without doing any diagnostic procedures or inquiring as to her addiction. Richmond was required to do repair work on Tran's automobile and various office equipment in exchange for the drug prescriptions.

Richmond had advised Tran that he was addicted to drugs and was abusing other drugs, and he showed Tran the needle marks on his arms, but Tran continued to give him prescriptions.

Other patients testified that they were told by Tran to claim their pain was in different parts of the body from time to time so that his records would not reflect that he had been prescribing drugs for the same pain in the same place over a period of many months. He also advised certain of these patients to fill the prescriptions at drug stores that did not have computers and to fill the prescriptions at different pharmacies not close to his office.

Some of the witnesses asked the doctor for drugs by name or by street name. Undercover witness Sanders went to Tran's office as a part of the undercover investigation. At the time he was sickly looking due to drug abuse and had needle marks on his hands and arms which were obviously discolored and swollen. He told the defendant he was taking pain killers because of a knee injury and needed a prescription for Percocet or Tylox. Both of these are Schedule II drugs and can be addictive. Sanders testified that the defendant checked his breathing but did not examine his knee and prescribed 30 Vicoden tablets. This is a Schedule III drug. He returned a week later again seeking Percocet or Tylox, and after five minutes with the defendant, he received another Vicoden prescription. The two undercover police officers described their visits to defendant's office as being without appointment and seeking "scripts," which is the street name for prescription drugs. These visits were tape recorded. Detective Milito saw the doctor eight times over two months, spent no more than five minutes with him on each visit and received prescriptions for controlled substances on each visit. Officer Zook saw the defendant four times over five weeks and told the defendant he needed Percodan to get him through the winter as a construction worker. On his first visit, Zook was dressed shabbily and had poured Bourbon whiskey on his clothes to give the appearance of being an alcoholic. Defendant refused to give him a Percodan prescription but did prescribe Vicoden and charged him $35 per visit.

The evidence supported the finding that the defendant's actions in prescribing controlled substances violated the Controlled Substances Act because he knowingly prescribed these drugs in an unlawful manner. In *United States v. Stump*, 735 F.2d 273, 275–76 (7th Cir.), *cert. denied*, 469 U.S. 864, 105 S.Ct. 203, 83 L.Ed.2d 134 (1984), the Court commented on the evidence which it found sufficient to sustain a conviction as follows:

> Improperly issuing a prescription for a controlled substance is sufficient to warrant a conviction under the Controlled Substances Act even though the doctor does not himself actually distribute the drugs and even though the prescription is not subsequently filled. The sheer number of prescriptions written to any one of several individuals in this case were themselves substantial evidence that the defendant knew that he was prescribing drugs improperly. He wrote so many prescriptions to the same persons during the short period of time covered by the indictment that the intervals between them could not possibly be consistent with legitimate medical treatment. He prescribed drugs in exchange for excessive money or for goods or services, with no meaningful physical examination beforehand. He wrote prescriptions in fictitious names for people whose correct names he knew. He referred to many drugs by their "street names" and directed his patients to fill their prescriptions only at different pharmacies. Expert evidence testimony was to the effect his conduct was inherently dangerous. Death could have resulted if the drugs were actually ingested by the patients at the dosage amounts being prescribed by Dr. Stump. Evidence of intentional misconduct was overwhelming.

In considering a challenge to the sufficiency of the evidence to convict, we determine whether after a review of "the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443

U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). We conclude from the record that ample evidence was presented on the above numbered counts from which the jury could reasonably have found that Tran was guilty of these charges. However, because of the improper introduction of reputation evidence by the government, these convictions are being reversed and the case is being remanded for a new trial if the prosecution so elects.

## IV.

Appellant attacks his convictions on 80 counts (1–8, 25–64, 69–84, 93–96, 101–112) claiming insufficient evidence. This claim applies only to the third essential element of the crime; there is no challenge to elements 1 and 2. These elements are (1) that Dr. Tran distributed or dispensed a controlled substance, (2) that he acted knowingly and intentionally, and (3) that his actions were not for legitimate medical purposes in the usual course of his professional medical practice or beyond the bounds of medical practice.

■ These challenged counts are those in which the patient who received the prescription did not testify. The government's case was made by the testimony of Dr. MacIntosh, copies of the prescriptions, and the introduction of exhibit 34, which is a summary report of the doctor's examination of 33 patient files taken from Tran's office. A review of this evidence persuades us that the government has not carried its burden of proving defendant's guilt on these counts beyond a reasonable doubt. Dr. MacIntosh described exhibit 34: "This is a summary report by me concerning charts that I reviewed that were furnished to me by you (The Assistant U.S. Attorney). I recorded the number of visits, the dates of the visits, what they were for and what was prescribed." Dr. MacIntosh discussed only a few of the patients in any detail. These included Emily Burns, Ronald Proffitt, and Donald Richmond, who all testified for the government. Dr. MacIntosh did not mention any of the 20 patients who did not testify, and who at four prescriptions each make up 80 of the counts contained in the indictment.

He did not discuss these patients by name nor did he comment on the prescriptions they had received. He neither examined nor interviewed any of these patients. No effort was made by the prosecution to focus his testimony on any of these 80 counts. In discussing the case of Emily Burns, who testified, Dr. MacIntosh was asked if medications given to this patient were justified. He stated, "This individual case taken by itself could be justified. Taking all the other cases together, and following the pattern that I have been reading for the 16 hours that I read, I wouldn't think it was justified." He was later asked: "Doctor, you have determined and you testified today that the situation with Emily Burns was justified. Can you say that about any other patient here?" The doctor responded: "Well, some of the patients just had a few entries, there were just three or four entries. On that basis, I have no way of judging whether they were valid or not because there was not enough ongoing relationship."

The government has convicted the appellant of 80 counts based upon the summary report of 33 patient files prepared and submitted by its medical expert and the testimony of the medical expert that the drug prescriptions contained in these files were made for other than legitimate medical purposes and beyond the bounds of medical practice. Although the witness admitted that he did not have sufficient information from some of the charts to conclude that the prescriptions were improper, these charts were included in the exhibit and also formed the basis of separate counts in the indictment, simply because they followed a pattern. This is not sufficient to convict a person of a felony, and it concerns us that, as to these 80 counts, defendant may have been found guilty of some counts by association—the association of the counts properly proved with those that were not.

The government argues that in *United States v. Stump*, 735 F.2d 273 (7th Cir.), *cert. denied*, 469 U.S. 864, 105 S.Ct. 203, 83 L.Ed.2d 134 (1984), its case was proved by documents collected from area pharmacists, the patient records from Dr. Stump's office, testimony of investigators and informants

and testimony of various patients. However, the court did not find patient prescriptions and records alone, supported only by the testimony of a doctor who had not interviewed or examined the patients, enough to support the conviction. *Stump* involved a conviction on 25 counts and there is no indication that any of these counts involved a person or patient who did not testify at trial. The issue in *Stump* was whether the prescriptions written for use by one Kelly Watson, which were not covered in the indictment, could be admitted under Federal Rule of Evidence 404(b) to prove motive, opportunity, intent or absence of mistake. The court approved the admission of this evidence. In the present case, however, the government is not trying to introduce the 80 prescriptions written to 20 nontestifying witnesses as 404(b) evidence, but as the primary evidence to convict on 80 felony charges. There is a substantial difference between 404(b) evidence and direct evidence introduced to prove the crime charged in the indictment.

We are equally unmoved by *United States v. Chin*, 795 F.2d 496 (5th Cir.1986), where the court found that abbreviated medical examinations were probative on the question of whether a legitimate medical purpose existed for the prescription, and patients asking for specific drugs by name were "red flags" to a doctor that the potential for drug abuse existed. These are certainly facts that a jury may consider in a prosecution under the Controlled Substances Act. However, it does not appear that the 11 counts on which Dr. Chin was convicted were supported only by the medical records and expert testimony. Five undercover agents testified as to their visits to Dr. Chin and the type of examination they received and the drug prescriptions they obtained. Their testimony was also supported by tape recordings of their meetings with the doctor. *Chin* does not reach the issue now before us.

The present case is a classic example of "overkill" by the prosecution. It obtained an indictment containing 136 counts, of which 80 counts were supported only by copies of the prescriptions and by Dr. MacIntosh's testimony together with his summary of the office charts of 20 patients, who did not testify.

Such tactics invite a jury to find guilt by association or as a result of a pattern, and to conclude that if the physician violated the Controlled Substances Act in those counts supported by the testimony of patient-witnesses as to their personal contact and conversations with the defendant, then the defendant must be guilty of the remaining counts. The additional 80 counts add very little to the prosecution, since 56 counts should be enough to satisfy the prosecutor and to provide proper punishment of a defendant if convicted.

In *United States v. Jones*, 570 F.2d 765 (8th Cir.1978), a physician was prosecuted for distributing Quaalude without legitimate medical purpose and outside the usual course of medical practice. The court held that the defendant could not be questioned about and the government could not introduce evidence relating to 478 prescriptions written by the defendant for Schedule II drugs, which prescriptions were not covered by the indictment, when there was no evidence concerning the doctor-patient relationship existing with respect to these prescriptions. In *Jones*, the prosecution introduced 478 prescriptions supported by the testimony of police officers who identified several of the patients named in the prescriptions as being known drug addicts. The Eighth Circuit found that the admission of this evidence under Federal Rule of Evidence 404(b) was error. Although the prosecution in *Jones* did not support its case with a medical expert, such as Dr. MacIntosh, such expert testimony does not remove the risk of guilt by association or by proof of a pattern, particularly in view of Dr. MacIntosh's testimony concerning his examination of and conclusions drawn from the files of Tran's files. "This individual case taken by itself could be justified. Taking all of the other cases together and following the pattern that I have been reading for the 16 hours that I read, I wouldn't think it is justified." This is an indication that each count in the indictment was not examined separately, but was presented as a part of a pattern. A defendant is entitled to individual consideration of every count in an indictment by the jury and evidence sufficient to convict on each count beyond a reasonable doubt, if he is to be con-

victed. Accordingly, we find that the evidence presented by the prosecution was not sufficient to convict Tran on Counts 1–8, 25–64, 69–84, 93–96, and 101–112. We reverse the convictions on these counts, and because the evidence presented was insufficient, defendant may not be tried upon these counts on remand.

## V.

■ We also find it was error to allow Dr. MacIntosh to bolster his opinion evidence by testifying that his conclusions as to Tran's actions were "essentially the same" as those of a Dr. Stevenson, who did not testify and whose report was not introduced into evidence. This was done over the objection of the defendant, and occurred as Dr. MacIntosh testified that he had examined Tran's charts and the transcript of grand jury testimony of some of the patients and reviewed Dr. Stevenson's opinions on the same charts. The witness testified: "Dr. Stevenson is a general surgeon who is a close friend of mine. He is also a lawyer, and he is well thought of in Northern Virginia. He has been president of the Medical Society." When asked if his conclusions were contrary to those of Dr. Stevenson, the witness responded, "No. My findings were essentially the same."

The court was aware that Dr. Stevenson was not going to testify and that his opinion as to the defendant's files was not going to be submitted as evidence. Therefore, the admission of MacIntosh's statement as to Stevenson's report was clearly hearsay and prejudicial to the defendant. Dr. MacIntosh could testify that he reviewed Dr. Stevenson's report and that he relied upon it in reaching his opinion, but he could not say that the two opinions or reports were essentially the same without calling Dr. Stevenson as a witness and putting his report into evidence.

■ The government argues that an expert witness may consult other experts, books and treatises on the subject and may consider hearsay in reaching his opinion. However, this misses the point. Essentially, the defendant is subjected to the testimony of a witness whom he may not cross-examine, and Dr. MacIntosh bolstered his testimony by claiming that an outstanding doctor, who is also a lawyer and president of the Medical Society, agrees with him.

Under Federal Rule of Evidence 703, expert opinion evidence is not objectionable because the expert has relied upon underlying information which is itself inadmissible, provided the inadmissible information is of a kind reasonably relied upon by experts in the field. Rule 703 provides:

> Bases of Opinion Testimony by Experts.
>
> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

In the present record, there is no indication that the medical report of Dr. Stevenson was "of a type reasonably relied upon by experts in a particular field in forming opinions or inferences upon the subject." Even if this foundation had been properly laid, which it was not, it would still have been improper for Dr. MacIntosh to and state that the two medical opinions were essentially the same.

In addition to the problems of hearsay and Stevenson's report being used to vouch for the opinion of MacIntosh, it is doubtful if Dr. Stevenson's report would qualify as data "of a type reasonably relied upon by experts in the particular field." The Stevenson report was prepared at the request of the prosecution and thereby is a forensic opinion or report in a criminal case. We question whether Dr. MacIntosh usually relies upon forensic medical opinions or reports in forming his opinions in his field of expertise—family medicine.

Reports specifically prepared for purposes of litigation are not, by definition, "of a type reasonably relied upon by experts in the particular field." Even though an expert

witness may base his opinion on underlying information, it does not follow that the otherwise inadmissible information may come into evidence just because it has been used by the expert in reaching his opinion. *See Marsee v. U.S. Tobacco Co.*, 866 F.2d 319, 323 (10th Cir.1989) (exclusion of medical expert's testimony of conversations with other physicians regarding cases which supported his opinion); *Bryan v. John Bean Div. of FMC Corp.*, 566 F.2d 541, 544–47 (5th Cir.1978) (excluded hearsay evidence in the form of opinions of non-testifying experts contained in two reports used by testifying expert in reaching his conclusion).

There is also the problem of Dr. Stevenson's qualifications to testify as an expert. His qualifications were not admitted, and we do not find Dr. MacIntosh's statement that Stevenson was "a close friend, a general surgeon, a lawyer and president of the Medical Society" qualified him as an expert in the field of family medicine, which was the discipline under consideration.

MacIntosh's testimony as to Stevenson's findings and his credentials was given in an effort to convince the jury of the accuracy and reliability of MacIntosh's opinions, and also to put before the jury Stevenson's opinion as to the defendant's actions without subjecting Stevenson to cross-examination. This is unfair to the defendant as it denies his fundamental right to cross-examination and is an improper use of expert testimony.

## VI.

◼ We find no merit to the claim that government witness William Jennings, an inspector for the Virginia Department of Health Professions, should not have been allowed to testify that in 1979 he warned Tran that the doctor might be "conned" into prescribing narcotics for some of his patients who were "known drug abusers." Tran contends that Jennings did not provide him with the names of any of these patients and there was no evidence that the defendant continued to treat them. Tran argues that this was improperly admitted as evidence of other crimes. We do not agree. If the doctor was being "conned," he was not guilty of violating the Controlled Substances Act which requires that he act with specific intent. If he was warned and did not heed the warning, the testimony was relevant to establish criminal intent and method of operation and was admissible. *United States v. Dunbar*, 614 F.2d 39 (5th Cir.) (en banc), *cert. denied*, 447 U.S. 926, 100 S.Ct. 3022, 65 L.Ed.2d 1120 (1980). A physician was presented for distributing controlled substances by means of prescriptions not in the usual course of medical practice. The court allowed the admission of a taped conversation between the doctor and an undercover agent concerning possible future transactions as evidence of intent.

We find no merit to the exceptions relating to the jury instructions.

## VII.

For the reasons stated hereinabove, all of the convictions are reversed, and the sentences and the order of forfeiture are set aside. There was insufficient evidence to convict the defendant on Counts 1–8, 25–64, 69–84, 93–96, and 101–112, so he may not again be tried on these counts, nor may he be retried on the eight counts upon which he was acquitted or the count dismissed before the verdict. As to the remaining counts, the case is remanded to the district court for further proceedings as may be appropriate.

*REVERSED AND REMANDED WITH INSTRUCTIONS.*