GUILLERMO RAMIREZ, Appellant, v. THE STATE OF NEVADA, Respondent.

No. 28984

May 19, 1998                                958 P.2d 724

[Rehearing denied September 24, 1998]

*Robert Bennett, Fernley,* for Appellant.

*Frankie Sue Del Papa,* Attorney General, Carson City; *Robert Estes,* District Attorney, and *Eileen Barnett* and *John Paul Schlegelmilch,* Deputy District Attorneys, Lyon County, for Respondent.

## OPINION

By the Court, ROSE, J.:

Appellant Guillermo Ramirez was convicted, pursuant to a jury verdict, of two counts of sexual assault of a minor under the age of fourteen and one count of lewdness with a minor under the age of fourteen, for the sexual assault of his five-year-old daughter. On the two counts of sexual assault, Ramirez was sentenced to two consecutive life sentences, each with parole eligibility after ten years. On the lewdness count, Ramirez was sentenced to six years of imprisonment to run concurrently with the life sentences.

On appeal, Ramirez argues that he was denied his Sixth Amendment right to confront an accusatory witness when the district court allowed the investigating officer to testify as to the ultimate factual conclusions of the examining physician's medical report which was not in evidence, and where the examining physician was not present for cross-examination. Further, Ramirez argues that the district court compounded this constitutional error by improperly vouching for the credibility and qualifications of the examining physician in response to a juror's written question. For reasons discussed below, we conclude that Ramirez's Sixth Amendment right of confrontation was infringed upon and, accordingly, we reverse his conviction and remand for a new trial.[1]

### FACTS

Maureen Ramirez (Maureen) and Ramirez were married on June 14, 1986, and their daughter, Jane[2], was born on March 14, 1989. During 1994 and 1995, Maureen worked the nightshift at Carson Tahoe Hospital and Ramirez worked during the day in Reno. As a result of their work schedules, they shared child care responsibilities and Ramirez routinely watched Jane and the couple's son at night while Maureen was at work.

Jane began kindergarten in September of 1994 as a happy, outgoing, well-adjusted girl. In the fall, Jane's teacher and family noticed changes in her behavior. Jane's kindergarten teacher

---

[1]Because we conclude that Ramirez's conviction warrants reversal solely on this issue, we do not address his additional assignments of error.

[2]To protect her identity, the daughter will hereinafter be referred to as "Jane."

noticed that she became sullen, quiet, and had trouble getting along with the other children. In January of 1995, Jane spent the night at the home of one of Maureen's adult cousins. That night, Jane repeatedly cried for no reason. Maureen retrieved Jane and put her to sleep on the sofa at home. When Maureen tried to awaken Jane to put her in bed, Jane allegedly screamed "[n]o, no, no, no," curled up in a ball, and did not want to be touched. Although Maureen did not know what was wrong with Jane, she decided that she no longer wanted Ramirez to watch their children because he routinely drank alcohol while watching them.

Because of increasing marital strife and concern for Jane's well-being, in February 1995, Maureen decided to send Jane to live with Teresa Cruse, Maureen's adult cousin and Jane's godmother. At that time, Cruse lived in New York State and was in her third year of law school at Cornell University. After Jane moved to New York, Maureen filed for divorce and requested legal and physical custody of Jane and her brother. The divorce became final on May 9, 1995; Ramirez was granted supervised visitation.

In January 1996, approximately one year after Jane moved to New York to live with Cruse, Jane tried to kiss Cruse with her mouth open. When Cruse explained that was not appropriate, Jane asked Cruse if she knew what a French kiss was. Cruse replied that she did not know and asked Jane if she knew. Jane replied "that's when someone kisses you and they put their tongue in your mouth." Jane added, "My dad did that to me but I didn't do that to him." When Cruse asked Jane when he did this to her, Jane became embarrassed and said, "Well Auntie [Cruse] . . . I was very hungry and I would do anything for food." Jane also explained that "[s]he didn't want to get beer in her, that she didn't like beer . . ." in reference to kissing her father after he had been drinking. Jane also told Cruse that her father had touched her genitals with his fingers on numerous occasions. Later, while shopping with Cruse, Jane pointed to a Vaseline jar and described how her father would use Vaseline when he touched her.

Based on this information, Cruse attempted to make a local police report, but was directed to the Lyon County Police Department. Eventually, Cruse spoke with Deputy Musgrave of the Lyon County Police Department. Deputy Musgrave commenced an investigation. He obtained a written statement from Cruse and arranged for Detective Lance Saunders of the Cherry Hill, New Jersey District Attorney's Office to interview Jane. Detective Saunders in turn arranged for Dr. Finkel, a New Jersey physician specializing in osteopathy, to examine Jane. The results of this

examination were inconclusive. In Nevada, Deputy Musgrave interviewed Maureen and other witnesses.

After Deputy Musgrave's preliminary investigation, Ramirez was arrested and charged with one count of sexual assault of a minor under fourteen years of age, a class A felony, in violation of NRS 200.366. Ramirez was also charged with two counts of lewdness with a minor under the age of fourteen years, a class B felony, in violation of NRS 201.230. After arresting Ramirez, Deputy Musgrave conducted an initial interview during which Ramirez denied ever touching Jane's genitals. Next, an official from the Nevada Division of Investigations interviewed Ramirez. During this second interview, Ramirez continued to deny touching Jane's genitals. Ramirez was interviewed a third time, again by Deputy Musgrave, during which Ramirez admitted to touching Jane on the legs, buttocks, stomach and arms to apply moisturizing medication for Jane's dry skin condition.

At the preliminary hearing held on March 7, 1996, Maureen, Cruse and Jane testified. Based on the testimony at this hearing, the State requested that the court dismiss the second charge of lewdness and add a second charge of sexual assault to the complaint; the Justice of the Peace granted this request. Consequently, Ramirez was bound over for trial on two counts of sexual assault of a minor under fourteen years of age and one count of lewdness with a minor under the age of fourteen.

At trial, the State's first witness was Deputy Musgrave. Throughout his testimony, Deputy Musgrave made repeated references to the report of Dr. Finkel, who had conducted a mental and physical examination of Jane at the request of the Cherry Hill, New Jersey District Attorney's Office. Dr. Finkel's report was never introduced into evidence, nor did Dr. Finkel testify during Ramirez's trial. Nonetheless, in response to a question pertaining to what information his investigation had uncovered, Deputy Musgrave testified:

> The typewritten reports I received from Lance Saunders, detective, who originated the case for me from [sic] in Cherry Hill, the medical reports received from Dr. Finkel all indicated to me that, in fact, a sexual abuse had transpired, and that Mr. Ramirez was a very strong suspect in same.

On cross-examination, in response to defense counsel's question as to the impetus for continuing his investigation, Deputy Musgrave responded that "[t]he information—the initial information provided by Ms. Cruse was followed up by an interview through the Cherry Hill prosecutor's office as well as a physical and psychological interview by the child sexual assault unit of the

prosecutor's office.'' Further, on redirect by the State, the following colloquy took place:

Q. And on that—After that initial interview, you took steps, didn't you take steps to verify what was being told to you?

A. Yes, sir.

Q. Significant steps, in fact?

A. Yes, sir.

Q. And investigator Saunders from the Cherry Hill Prosecutor's Office interviewed [Jane], right?

A. Yes.

Q. On videotape?

A. Yes.

Q. Was there anybody else in the room except for investigator Saunders and [Jane]?

A. Negative.

Q. He sent her to a doctor?

A. Yes, sir.

Q. Did the doctor interview her?

A. Yes, sir, doctor—

Mr. Pederson: Objection, Your Honor, this calls for knowledge not within this witness' personal knowledge. He was not back in New Jersey.

The Court: Well, he can certainly state as far as an investigator goes, as far as the investigative process, if indeed something took place, and that was within the realm of whatever.

Mr. Pederson: He asked specifically who was in the room.

The Court: Well, I think that was the question before, but in any event he can state whether he knows if a medical or some kind of doctor examination took place.

By Mr. Shelegelmilch:

Q. And you had that happen.

A. Yes.

Q. And then you testified that was from a doctor Martin Finkel?

A. Yes.

Q. And you reviewed his stuff, his report?

A. Yes.

Q. All part of your investigation?

A. Yes.

Q. Okay. And at the end of the investigation, or during the process of the investigation, you requested a warrant?

A. Yes.

Q. Why.

A. The information led me to believe that I had probable cause that a felony had, in fact, taken place, and that Mr. Ramirez was, in fact, the suspect in that felony.

During a recess following Deputy Musgrave's testimony, the jury submitted a note to the judge which asked whether Jane had in fact been examined by a doctor. The judge responded that "Dr. Finkel, the New Jersey doctor, conducted a complete physical and mental examination of [Jane]. Dr. Finkel is an osteopath in New Jersey, who has conducted physical and mental examinations of sexually abused persons and conducted that in [Jane's] case."

When the trial resumed, the State presented numerous other witnesses including Jane, Dr. Elizabeth Richitt, a clinical psychologist who had also examined Jane, Jane's kindergarten teacher, and Cruse. During her testimony, Jane described how her father would rub her pubic area when her mother was not home. In demonstrating her father's actions on a teddy bear, Jane testified that it "kind of hurt." Jane testified that she recalled that Ramirez put his finger inside her and that she pretended to be asleep while Ramirez abused her. Jane also testified that while Ramirez was touching her he said, "I hate my wife." Jane further testified that her father touched her more times than she knew how to count and that the touching began at about the time that she started kindergarten, in August of 1994 and ended sometime after Christmas, 1994. Jane concluded her direct testimony by saying that she was happier living with Cruse, away from her father.

Following Jane's testimony, Cruse took the stand. Cruse testified as to the circumstances surrounding Jane's initial disclosure of abuse. Pursuant to the court's grant of the State's motion in limine, Cruse's testimony included many hearsay statements made by Jane, describing incidents of sexual abuse. After Cruse's testimony, Maureen testified on behalf of the State. Lastly, Ramirez took the stand in his defense and testified that he had never touched Jane inappropriately.

The jury returned a verdict of guilty on all three counts. For each count of sexual assault, Ramirez received two consecutive life sentences with the possibility of parole after ten years. For the single count of lewdness, Ramirez was sentenced to a term of six years, to run concurrently with the two life sentences.

Ramirez now appeals.

## DISCUSSION

Ramirez argues that portions of Deputy Musgrave's testimony and the Judge's response to the written jury question constituted

inadmissible hearsay, the admission of which violated his Sixth Amendment right to confront witnesses against him. Specifically, Ramirez contends that Deputy Musgrave's repeated references to Dr. Finkel's examination, along with the judge's commentary as to its thoroughness, so strongly suggested that the physical examination factually confirmed sexual assault, that Dr. Finkel effectively testified as a witness on behalf of the State. Consequently, Ramirez argues that the State was able to proffer the expert opinion of Dr. Finkel as to the ultimate issue without being subjected to the scrutiny of cross-examination, in violation of his Sixth Amendment right to confrontation. We agree.

The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. The Sixth Amendment's guarantee of the right of an accused to confront accusatory witnesses is a fundamental right that is made obligatory on the states by the Fourteenth Amendment. Pointer v. Texas, 380 U.S. 400, 403 (1965). Further, the United States Supreme Court has held that "[c]onfrontation means more than being allowed to confront the witness physically. 'Our cases construing the [confrontation] clause hold that a primary interest secured by it is the right of cross-examination.'" Davis v. Alaska, 415 U.S. 308, 315 (1974) (quoting Douglas v. Alabama, 380 U.S. 415, 418 (1965)).

Because of their shared emphasis on cross-examination, the hearsay rule and the Confrontation Clause are designed to promote similar values and both share the goal of excluding evidence that is unreliable. California v. Green, 399 U.S. 149, 155 (1970). While both are designed to avoid similar evils, they are not identical in scope; the Confrontation Clause "'[e]mbodies notions of individual rights far broader than the technical hearsay rules.'" State v. Apilando, 900 P.2d 135, 139 (Haw. 1995) (quoting O. Weinstein, *Coy v. Iowa: Reconciling a Defendant's Right to Confrontation with a Child-Witness' Interest in Avoiding Undue Psychological Trauma*, 23 Loy. L.A. L. Rev. 415, 437 (1989)). Because the hearsay rule and the Confrontation Clause are not co-extensive, the Supreme Court has held that the Confrontation Clause "bars the admission of some evidence that would otherwise be admissible under an exception to the hearsay rule." Idaho v. Wright, 497 U.S. 805, 814 (1990).

To satisfy the requirements of the Confrontation Clause, if the State seeks to introduce hearsay statements against a criminal

558

defendant, such evidence must bear adequate indicia of reliability by either falling within a firmly rooted hearsay exception, or the State must demonstrate that the statement possesses particularized guarantees of trustworthiness. Ohio v. Roberts, 448 U.S. 56, 66 (1980). If the statement does not fall within a firmly rooted hearsay exception, the statement is " 'presumptively unreliable and inadmissible for Confrontation Clause purposes.' " Idaho v. Wright, 497 U.S. 805, 818 (1989) (quoting Lee v. Illinois, 476 U.S. 530, 543 (1986)). To rebut this presumption of inadmissibility, the State must demonstrate that the statement bears particularized guarantees of trustworthiness based on the "totality of circumstances that surround the making of the statement and that render the declarant particularly worthy of belief." Id. at 820.

If hearsay evidence that does not fall within a firmly rooted exception is presumptively inadmissible for Confrontation Clause purposes, it necessarily follows that hearsay which fails to qualify for any exception must also be presumptively unreliable and inadmissible. As noted by Professor Bartels:

> [W]henever . . . a hearsay statement by a non-testifying declarant that does not come within any exception to the hearsay rule—is admitted against a criminal defendant, there is presumptively a Confrontation Clause violation, subject only to the prosecution's ability to meet its burden of showing that the circumstances under which the statement was made gave it adequate particularized guarantees of trustworthiness.

Robert Bartels, *The Hearsay Rule, the Confrontation Clause, and Reversible Error in Criminal Cases*, 26 Ariz. St. L.J. 967, 975 (1994).

In United States v. Tran Trong Cuong, 18 F.3d 1132, 1135 (4th Cir. 1994), the Fourth Circuit was confronted with a situation where hearsay evidence, which did not fall within any exception to the hearsay rule, was admitted against a criminal defendant. During trial, the government called as an expert medical witness Dr. MacIntosh, who testified that another medical doctor, Dr. Stevenson, had prepared a report after reviewing some of the defendant's medical files on several of the defendant's patients. *Id.* Dr. MacIntosh vouched for Dr.Stevenson's qualifications and testified that Dr. Stevenson's conclusions and findings were similar with his own. *Id.* Dr. Stevenson did not testify during the defendant's trial nor was his report admitted into evidence. *Id.* at 1143.

The Fourth Circuit determined that Dr. MacIntosh had served as an improper conduit for inadmissible hearsay. *Id.* at 1143-44.

Because Dr. Stevenson's report was prepared at the request of the prosecution in anticipation of litigation, the report constituted inadmissible hearsay which did not fall under any exception to the hearsay rule. *Id*. at 1143-44. Accordingly, because of the government's failure to rebut the presumption of unreliability and inadmissibility, the court reversed the defendant's conviction by holding:

> MacIntosh's testimony as to Stevenson's findings and his credentials was given in an effort to convince the jury of the accuracy and reliability of MacIntosh's opinions, and also to put before the jury Stevenson's opinion as to the defendant's actions without subjecting Stevenson to cross-examination. This is unfair to the defendant as it denies his fundamental right to cross-examination . . . .

*Id*. at 1144.

Similarly, in United States v. Check, 582 F.2d 668, 669 (2d Cir. 1978), the government sought to introduce the out-of-court statements of a drug transaction intermediary through the trial testimony of an undercover agent, without subjecting the intermediary to the rigors of cross-examination. In *Check*, an undercover agent attempted to purchase narcotics from the defendant through the assistance of an intermediary. *Id*. at 670.

Eventually, the defendant was arrested and charged with illegal narcotics distribution. *Id*. at 670. At the defendant's trial, the intermediary refused to testify; thus, in order to introduce the contents of the numerous conversations between the undercover agent and the intermediary which incriminated the defendant, the government carefully limited the undercover agent's testimony to what he had said to the intermediary and avoided any testimony pertaining to what the intermediary had told him. *Id*. at 675.

The Second Circuit concluded that portions of the undercover agent's testimony constituted inadmissible hearsay because such "testimony was a transparent attempt to incorporate into the officer's testimony information supplied by the informant who did not testify at trial." *Id*. at 679. Because the court determined that the jury may well have been influenced against the defendant, the court reversed his conviction by concluding:

> Thus, by incorporating [the intermediary's] hearsay into [the undercover agent's] testimony, the government received the benefit of having, in effect, an additional witness against [the defendant] while simultaneously insulating from cross-examination that witness, a witness whom we can safely assume would have been subjected to a scathing, and perhaps effective, cross-examination by defense counsel.

*Id*. at 683.

■■■■■■  ■■■

■■■■■■

Turning to the case at hand, in light of the foregoing discussion, we address first the State's contention that because Ramirez failed to make a timely objection to Deputy Musgrave's testimony at trial, he is barred from asserting that his right of confrontation was violated on appeal. While Ramirez's defense counsel was hardly vigilant in preserving errors for appellate review through the use of timely and well-founded objections, we note that Ramirez made one objection in response to the State's question of Deputy Musgrave as to which doctor had performed Jane's medical examination. Because of Ramirez's objection at a critical juncture of Deputy Musgrave's testimony, we conclude that he properly preserved his constitutional issues for review by this court. Further, in light of our willingness to address constitutional error *sua sponte,* Sterling v. State, 108 Nev. 391, 394, 834 P.2d 400, 402 (1992), we conclude that it would be unreasonable to hold that Ramirez made a knowing and intelligent waiver of his Sixth Amendment Confrontation Clause rights by failing to vociferously object to all of Deputy Musgrave's problematic testimony.

■■■■■■

The State argues that the objectionable portions of Deputy Musgrave's testimony did not constitute hearsay because he did not testify as to the specific findings and conclusions made by Dr. Finkel. In this regard, the State argues that Deputy Musgrave merely testified to the fact that Dr. Finkel had performed a medical examination and that this was the reason he commenced an investigation. Upon closer examination of the record on appeal, we do not believe that Deputy Musgrave's testimony was as benign as the State suggests.

During trial, Deputy Musgrave stated that in addition to the reports received from Detective Saunders, "the medical reports received from Dr. Finkel . . . indicated to me that, *in fact,* a sexual abuse had transpired, and that Mr. Ramirez was a very strong suspect in same." (Emphasis added.) Further in his testimony, Deputy Musgrave stated that "the information [Dr. Finkel's medical findings and Detective Saunder's reports] led me to believe that I had *probable cause* that a felony had, in fact, taken place, and that Mr. Ramirez was, *in fact,* the suspect in that felony." (Emphasis added.)

NRS 51.035 defines hearsay as "a statement offered in evidence to prove the truth of the matter asserted." NRS 51.045 defines a statement as an "oral or written assertion; or . . . [n]onverbal conduct of a person, if it is intended by him as an assertion." When scrutinized pursuant to these standards, Dr. Finkel's written report constituted a hearsay statement which was

artfully introduced through Deputy Musgrave's testimony in order to establish that Ramirez had, in fact, sexually assaulted his daughter. Dr. Finkel's medical report constituted a written asser- tion that was neither introduced into evidence nor made by the declarant while testifying at trial. Contrary to the State's assertion that Deputy Musgrave merely testified that Dr. Finkel had per- formed a medical examination on Jane, the only relevance of Deputy Musgrave's foregoing testimony was to demonstrate that Dr. Finkel's findings confirmed that Ramirez had, in fact, sexu- ally assaulted Jane—that is, to prove the truth of the matter asserted.

The district court, without Ramirez's express consent on the record, compounded the problem by answering the jury's ques- tion by stating that Dr. Finkel was experienced in conducting ''physical and mental examinations of sexually abused persons'' and had ''conducted a complete physical and mental examination of Jane.'' With Deputy Musgrave's improper testimony, com- bined with the district court judge's vouching for the credentials and thoroughness of Dr. Finkel's examination, the jury was clearly given the impression that Dr. Finkel confirmed that a sexual assault had occurred.[3]

Because Dr. Finkel was not present to testify and be cross- examined at Ramirez's trial, the only means by which Dr. Finkel's findings could come before the jury was via an estab- lished exception to the hearsay rule, which in this case is lacking. While it might appear that Dr. Finkel's findings could be intro- duced pursuant to NRS 51.115 as a statement made for purposes of medical diagnosis or treatment, we have previously maintained in the child sexual assault context that when examinations at the instigation of law enforcement personnel are investigatory in nature, the results are generally inadmissible for a lack of trust- worthiness. *See* Felix v. State, 109 Nev. 151, 193-94, 849 P.2d 220, 249 (1993).

Similarly, Dr. Finkel's findings could not be introduced pursu- ant to the residual exception codified at NRS 51.075[4] because the

---

[3]While Dr. Finkel's report was not contained in the record on appeal, both parties suggest in their appellate briefs that Dr. Finkel's examination was, at best, inconclusive as to whether Jane had been sexually assaulted. Thus, not only had the jury been exposed to Dr. Finkel's medical report which was not in evidence, the jury was left with the erroneous impression that such report had, in fact, confirmed that Jane was sexually assaulted.

[4]NRS 51.075 provides:
1. A statement is not excluded by the hearsay rule if its nature and the special circumstances under which it was made offer assurances of accuracy

562

United States Supreme Court deemed Idaho's similar residual exception not to be firmly rooted for Confrontation Clause purposes and thus, evidence admitted pursuant to that exception violated a criminal defendant's Confrontation Clause rights where the State failed to rebut the presumption of unreliability and inadmissibility. *See* Idaho v. Wright, 497 U.S. 805, 817 (1989).

What we are left with in this case are patently inadmissible hearsay statements that were used to prove the truth of the matter asserted against a criminal defendant. Our review of the record reveals that the State did not attempt to rebut the constitutional presumption of unreliability and inadmissibility by showing that Dr. Finkel's findings bore particularized guarantees of trustworthiness. Accordingly, our task is to determine whether the introduction of Dr. Finkel's findings, in violation of Ramirez's Sixth Amendment Confrontation Clause rights, requires reversal of his conviction and a new trial. After a thorough examination of the record, we conclude in the affirmative.

Trial error that rises to the level of constitutional magnitude requires that a criminal defendant's conviction be reversed on appeal unless such error "was harmless beyond a reasonable doubt." Chapman v. California, 386 U.S. 18, 24 (1967). Here, we cannot declare a belief that the introduction of Dr. Finkel's findings, through the testimony of Deputy Musgrave and in combination with the improper vouching by the district court judge, was harmless beyond a reasonable doubt. To the contrary, the jury placed significant weight on Deputy Musgrave's testimony, which indicated that Dr. Finkel had factually confirmed sexual assault, as evidenced by the jury's written question to the district court judge asking the judge to confirm that Dr. Finkel had, in fact, performed an examination on Jane.

By using Deputy Musgrave as an improper conduit for Dr. Finkel's findings, the State was able to introduce damaging and severely prejudicial inadmissible hearsay against a criminal defendant. In effect, the State acquired an additional, and highly credible, expert witness against Ramirez without affording Ramirez the opportunity to cross-examine Dr. Finkel to expose weaknesses in his conclusions or impeach his qualifications. Nor

not likely to be enhanced by calling the declarant as a witness, even though he is available.

2. The provisions of NRS 51.085 to 51.305, inclusive, are illustrative and not restrictive of the exception provided by this section.

was it proper for the district court to vouch for the qualifications of Dr. Finkel in response to the jury's written question. In this case, the State—not the district court—had the evidentiary burden of establishing a sufficient foundation as to Dr. Finkel's qualifications had it sought to introduce Dr. Finkel as an expert witness. Such improper vouching by the district court cannot be countenanced by this court.

By introducing Dr. Finkel's findings through Deputy Musgrave's testimony, in combination with the district court's improper vouching for Dr. Finkel's qualifications and credibility, the jury was significantly influenced by a witness who was not subjected to cross-examination, in violation of Ramirez's Sixth Amendment Confrontation Clause rights. We cannot say that these errors were harmless beyond a reasonable doubt. Accordingly, based on the foregoing, we vacate the trial court's judgment and sentence and remand this case for a new trial.

SPRINGER, C. J., and YOUNG, J., concur.

SHEARING, J., with whom MAUPIN, J., joins, dissenting:

I would affirm the conviction of Guillermo Ramirez on two counts of sexual assault of a minor under fourteen years of age and one count of lewdness with a minor under fourteen years of age.

I do not agree that the statements of Deputy Musgrave or the district court, which indicated that Dr. Finkel examined the victim, violated the hearsay rule or the confrontation clause. Introducing Dr. Finkel's statements regarding his findings would have violated the hearsay rule and given the defendant the right to confront Dr. Finkel; however, neither Deputy Musgrave nor the district court did so. The fact that the victim underwent a medical examination in New Jersey was introduced solely as one of the reasons why Deputy Musgrave continued his own investigation and filed charges. Since the State did not introduce Dr. Finkel's statements into evidence, he thus was not a witness against the defendant and did not trigger the defendant's right of confrontation. Dr. Finkel did not become a witness solely because other witnesses acknowledged his involvement in the case.

Furthermore, introducing the fact that an examination had been conducted does not constitute the plain error necessary to trigger this court's review, in light of the fact that the defendant did not object to its introduction at trial. "Failure to object below generally precludes review by this court. . . ." Sterling v. State, 108 Nev. 391, 394, 834 P.2d 400, 402 (1992). This court will, however, address plain error and constitutional error *sua sponte*.

*Id.* Plain error is defined as error "so unmistakable that it reveals itself from a casual inspection of the record." Patterson v. State, 111 Nev. 1525, 1530, 907 P.2d 984, 987 (1995). Not only did the defendant fail to object to the statements regarding Dr. Finkel's examination of the victim, but also, defense counsel first mentioned the examination. In fact, defense counsel told the jury the results of the examination, even though they were never introduced into evidence. In defense counsel's opening statement, he said: "That little girl went to see a doctor. There is no evidence of any penetration, she is still a virgin. There is [sic] no tears. There is no physical evidence that this woman, this little girl was ever harmed in any way." In light of this defense statement to the jury, the introduction of evidence by the prosecution of the simple fact that an examination occurred certainly was not "plain error."

Even if introduction of evidence that an examination had occurred had violated the hearsay rule, that error would have been harmless in this case. Ample evidence proved that Ramirez committed the crimes charged. The victim's testimony was clear, consistent, and corroborated by: (1) the changes in her behavior that coincided with the time of the assault, (2) the spontaneous nature of her initial revelations, (3) the level of her sexual knowledge, inappropriate for her age, but consistent with her allegations, and (4) her ability to identify the substance defendant used during the assaults.

There is no basis for reversing these convictions.