**UNITED STATES of America, Plaintiff–Appellee,**

v.

**James Earl LANDERS, Defendant–Appellant.**

Nos. 93–5872, 93–6363.

United States Court of Appeals, Sixth Circuit.

Argued Sept. 20, 1994.

Decided Nov. 2, 1994.

Rehearing and Suggestion for Rehearing En Banc Denied Dec. 20, 1994.

644

Linda Harris (argued and briefed) and Timothy R. DiScenza, Asst. U.S. Attys., Office of the U.S. Atty., Memphis, TN, for plaintiff-appellee.

Susan G. James (argued and briefed), Montgomery, AL, for defendant-appellant.

Before: MARTIN, KRUPANSKY, and BOGGS, Circuit Judges.

KRUPANSKY, Circuit Judge.

The defendant-appellant, James Earl Landers ("Landers"), challenged his jury conviction and resultant sentence for conspiracy to possess, with intent to distribute, 4,500 dosage units of dilaudid,[1] a Schedule II controlled substance, in violation of 21 U.S.C.

1. Technically known as hydromorphone hydrochloride, this hydrogenated ketone of morphine is an addictive narcotic analgesic. *Physicians' Desk Reference*, 1126–27 (48th ed. 1994).

2. Rose Landers passed away prior to the defendant's January 5–7, 1993 trial.

3. The appellant had been sentenced on January 19, 1990 to serve a 27 month custodial term plus three years of supervised release. His imprisonment terminated, and his supervised release period commenced, on July 22, 1991.

§§ 812, 841(a)(1), and 846. The appellant additionally contested the revocation, as a consequence of this conviction, of a supervised release term imposed in an earlier prosecution.

In April 1992, Landers and his wife Rose,[2] who resided in Memphis, Tennessee, became targets of a Drug Enforcement Administration (DEA) investigation of a dilaudid distribution ring following the arrest of a major supplier in New York City, Alberto Casamador. Evidence seized from Casamador's residence identified Rose as a possible customer. At that time, Landers was on supervised release for a prior dilaudid offense.[3] Enlisting the assistance of a confidential informant, Bobby Alexander, a confederate of Casamador who had allegedly transacted sizeable dilaudid sales with the defendant Landers and his wife Rose on previous occasions, DEA agents designed a sting operation in which Alexander offered, via a monitored telephone conversation, to sell dilaudid to Rose during an impending visit to Memphis. In response, Rose advised Alexander that he should deal with the defendant because she would be out of town at that time.

On April 30, 1992, in accordance with prearranged plans, Alexander and Special Agent Namon Jones (posing as Alexander's supplier) rendezvoused with Landers at a Memphis motel. Special Agent Dennis Mihalopoulos secretly videotaped the subsequent conversation. Landers had been informed by Alexander prior to his arrival that between three and five thousand tablets would be available for purchase from Jones;[4] Jones in fact had 4,500 doses. At the outset of the negotiations, Landers evinced suspicion, nervously peering about the room and questioning why

4. In response to Landers' inquiry by telephone on April 28, 1992 as to "what street you gonna be on, three or four?" Alexander advised Landers that he and "his man" who owned the drugs would be on " 'bout three or four ... big ones." The confidential informant testified that this coded conversation meant that three or four thousand pills would be available for sale to Landers. The evidence further revealed that during a pre-meeting telephone conversation on April 30, 1992, Alexander informed the appellant that they were "on Fifth Street, on the G side," which signified that the men had 5,000 units for distribution.

no vehicle in the parking lot displayed a New York license plate. Ultimately, in a private conversation conducted outside the motel room, Landers attempted to convince Alexander to secure the drugs, or a portion of them, for him "on consignment," meaning that the defendant wanted the contraband "fronted" to him without payment. Landers purportedly would subsequently compensate the supplier after redistributing the pills to buyers. Alexander testified that, in the past, the Landerses had always paid cash in advance for dilaudid. Jones avowed that DEA policy prohibited allowing drugs to "walk" in the fashion advocated by Landers. The appellant subsequently left the putative suppliers without securing any dilaudid.

During a telephone conversation initiated by Alexander on the following day for the purpose of again offering the contraband for sale, Landers twice threatened to kill Alexander and angrily directed him not to telephone him or Rose again. The defendant further disclaimed at this time any interest in procuring dilaudid through Alexander. On the same day (May 1, 1992), during a search of the Landerses' residence conducted by DEA agents and local police pursuant to a warrant, approximately $10,200 in U.S. currency (which apparently carried a narcotic scent) was found in a bathroom compartment by a narcotics-sniffing dog and seized by investigators. The authorities also found a key in the dining room, which unlocked a safe deposit box at a bank registered to Rose and a third individual, which contained $62,000 in cash plus jewelry. Additionally, the officers discovered financial documents evidencing sizeable financial transactions involving the defendant and his wife.

After conviction by a jury, Landers was sentenced on June 18, 1993 to 188 months in prison plus 3 years of supervised release. Subsequently, on September 22, 1993, the sentencing judge in his earlier dilaudid prosecution, following a supervised release revocation hearing, imposed an additional 15 months of incarceration to be served consec-

utively to the 188 months imposed in the 1993 case, as punishment for violating the conditions of the supervised release assessed in 1990. Landers perfected timely appeals from both judgments.

■ The defendant first urged that his negotiations with an undercover agent and with a confidential informant to acquire controlled substances were insufficient to prove a 21 U.S.C. § 846 narcotics conspiracy. *See United States v. Pennell,* 737 F.2d 521, 536 (6th Cir.1984), *cert. denied,* 469 U.S. 1158, 105 S.Ct. 906, 83 L.Ed.2d 921 (1985). However, the government argued that *Landers and his wife* conspired to obtain dilaudid between March 1 and May 8, 1992, not that Landers conspired with those who intended to effect his arrest. See Indictment, *J.App.* at 11–12. A criminal conspiracy is born when the members agree to participate in a collective venture designed to accomplish a common illegal objective. *U.S. v. Rios,* 842 F.2d 868, 873 (6th Cir.1988) (per curiam), *cert. denied,* 488 U.S. 1031, 109 S.Ct. 840, 102 L.Ed.2d 972 (1989).[5] A complete review of the record below reflected that the evidence admitted at trial was sufficient to prove the existence of a conspiratorial agreement between the defendant and his wife to secure an illegal narcotic as alleged in the Indictment, and accordingly the jury's verdict should be sustained. *See id.* at 872.

■ The appellant's second assignment of error faulted the district court's refusal of a requested jury instruction concerning the defendant's alleged withdrawal from the conspiracy. A trial court has no duty to instruct the jurors on a defense theory which was not supported by the law or the evidence. *United States v. Sassak,* 881 F.2d 276, 278 (6th Cir.1989). The trial record at best proved that Landers changed his mind about purchasing dilaudid from Jones and Alexander. No evidence supported the conclusion that Landers intended to withdraw from the conspiracy he had entered into with his wife to procure dilaudid, or that Landers communi-

5. See also *United States v. McLernon,* 746 F.2d 1098, 1107 (6th Cir.1984) ("the 'essence of the crime of conspiracy is agreement[,]' ") *quoting United States v. Warner,* 690 F.2d 545, 549 (6th Cir.1982); *United States v. Hitow,* 889 F.2d 1573,

1577 (6th Cir.1989) (proof of an expressed or formal conspiratorial agreement between the parties is not necessary; such an agreement may be inferred from the conduct of the parties).

cated such an intention to Rose. *See United States v. U.S. Gypsum Co.*, 438 U.S. 422, 464–65, 98 S.Ct. 2864, 2887, 57 L.Ed.2d 854 (1978) (withdrawal from, or abandonment of, a criminal conspiracy must be "communicated in a manner reasonably calculated to reach coconspirators[.]"). The lower court did not err in rejecting the defense's requested instruction on withdrawal from the criminal conspiracy because no evidence supported that theory.

■ The defendant invested his heaviest reliance upon his third appellate theory, that the sentencing court erroneously calculated his offense level based upon an inflated calculation of the narcotics amount. Landers argued that the court below should have tabulated his offense level with reference to the weight of the active narcotic ingredient (hydromorphone) in the 4,500 dilaudid tablets which he had purportedly conspired to obtain, rather than the full weight of the 4,500 tablets.[6] He posited that it is as illogical to include in the sentencing calculus the weight of inert carrier material in the pills as it would be to include the weight of a syringe used to inject hydromorphone or the weight of a brief case used to transport the narcotic. The appellant supported his position by citation to the asterisk note (final paragraph) to United States Sentencing Guidelines § 2D1.1(c) [the Drug Quantity Table],[7] as amended effective November 1, 1993,[8] which mandates that, *in LSD cases*, the weight of doses on a carrier medium such as blotter paper will not be considered, but rather a standard weight of 0.4 milligrams per dose will be substituted.[9] In addition, Landers cited his 1990 dilaudid sentencing, where the trial judge determined his base offense level with reference to the weight of the hydromorphone within the tablets rather than the weight of the entire doses.

Congress has mandated in 21 U.S.C. § 841(b)(1) that a defendant shall be sentenced based upon the weight of a "mixture or substance" containing a controlled narcotic, rather than with reference only to the weight of the pure narcotic. *See Chapman v. United States*, 500 U.S. 453, 459, 111 S.Ct.

---

**6.** The PSR attributed an average weight of 90 milligrams to each of the 4,500 pills, for a total weight of 405 grams, which translated into 1,012.5 kilograms of marijuana, yielding a base offense level of 32. Landers argued that, because the capsules at issue each contained at most 4 milligrams of hydromorphone, no more than this amount should have been used to determine his base offense level, rather than the full weight of 90 milligrams per tablet.

**7.** The Sentencing Commission's Notes and Commentary to the guidelines is authoritative and binding upon the courts unless such are inconsistent with the Constitution, a federal statute, or the guidelines themselves. *Stinson v. United States*, — U.S. —, —, 113 S.Ct. 1913, 1915, 123 L.Ed.2d 598 (1993).

**8.** Because Landers was sentenced in July 1993, the Guidelines in effect on November 1, 1992 applied. However, an amendment listed in Guidelines § 1B1.10(d) (Nov. 1, 1993) may be applied retroactively under 18 U.S.C. § 3582(c)(2) if to do so would lower the defendant's applicable Guidelines sentencing range. See Guidelines § 1B1.10(a). Amendment 488, which is listed in section 1B1.10(d), implemented the revisions to the asterisk note and the Commentary to § 2D1.1(c) advanced by the appellant herein. See Appendix C to the Guidelines Manual, § 488, pages 324–25 (Nov. 1, 1993). Pursuant to 18 U.S.C. § 3582(c)(2), a defendant may, under certain circumstances, pursue post-sen-

tencing relief in the district court where the Sentencing Commission has subsequently reduced the governing sentencing range. *See, e.g., United States v. Dullen*, 15 F.3d 68 (6th Cir. 1994). Because this court rules that the 1993 amendment urged by the appellant could not affect his sentencing range as a substantive matter, it does not pass upon whether Amendment 488 may be applied retroactively by an appellate panel where, as here, the appellant had not first moved for post-sentencing relief in the district court under 18 U.S.C. § 3582(c)(2). *Accord, United States v. Vincent*, 20 F.3d 229, 238 (6th Cir.1994) in which the court ruled that Amendment 484 [effective November 1, 1993], which was also included in the Guidelines § 1B1.10(d) listing of retroactive amendments with respect to 18 U.S.C. § 3582(c)(2), could not substantively affect the appellant's sentencing even if it was assumed to apply retroactively on appeal, where the opinion did not reflect that a motion for post-sentencing relief had been first initiated in the district court.

**9.** The 1993 amendment to the asterisk note to § 2D1.1(c) added, inter alia, a final paragraph which specifically provides:

> In the case of LSD on a carrier medium (*e.g.*, a sheet of blotter paper), do not use the weight of the LSD/carrier medium. Instead, treat each dose of LSD on the carrier medium as equal to 0.4 mg of LSD for the purposes of the Drug Quantity Table.

1919, 1925, 114 L.Ed.2d 524 (1991). The asterisk note to Guidelines § 2D1.1(c) [in both the November 1, 1992 and November 1, 1993 versions] directs that "[u]nless otherwise specified, the weight of a controlled substance set forth in the table refers to the entire weight of any mixture or substance containing a detectable amount of the controlled substance."

Although this circuit has not heretofore ruled in a published opinion upon the calculation of the weight of dilaudid tablets for sentencing purposes, it has announced in at least six unpublished per curiam decisions that the entire weight of dilaudid tablets, rather than merely the quantity of hydromorphone contained therein, must be taken into account, and therefore the potency of the particular doses at issue was irrelevant for sentencing purposes as long as they contained *some* amount of active ingredient. *United States v. Kiestler*, Nos. 92–5099/5600/5601, 995 F.2d 1068, 1993 WL 172878, 1993 U.S.App. LEXIS 13092 (6th Cir. May 21, 1993); *United States v. Tapert*, No. 92–1628, 993 F.2d 1548, 1993 WL 168923, at *2–3, 1993 U.S.App. LEXIS 12551, at *7–9 (6th Cir. May 19, 1993); *United States v. Rogers*, No. 91–2209, 976 F.2d 734, 1992 WL 217722, at *5–6, 1992 U.S. LEXIS 22408, at *20 (6th Cir. Sept. 9, 1992); *United States v. Williams*, No. 91–5134, 945 F.2d 406, 1991 WL 191549, 1991 U.S.App. LEXIS 23163 (6th Cir. Sept. 27, 1991); *United States v. Sims*, No. 90–6062, 936 F.2d 574, 1991 WL 109387, 1991 U.S.App. LEXIS 13694 (6th Cir. June 21, 1991); *United States v. Welch*, No. 90–5678, 933 F.2d 1010, 1991 WL 88361, 1991 U.S.App. LEXIS 11777 (6th Cir. May 28, 1991). No pronouncement of the Sixth Circuit supports a contrary result. Moreover,

at least six sister circuits have ruled that the full weight of dilaudid tablets must be considered when determining sentencing quantification, and none has mandated to the contrary. *United States v. Crowell*, 9 F.3d 1452, 1454 (9th Cir.1993); *United States v. Young*, 992 F.2d 207, 209–12 (8th Cir.1993); *United States v. Blythe*, 944 F.2d 356, 362–63 (7th Cir.1991); *United States v. Shabazz*, 933 F.2d 1029, 1035–36 (D.C.Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 431, 116 L.Ed.2d 451 (1991); *United States v. Lazarchik*, 924 F.2d 211, 213–14 (11th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 96, 116 L.Ed.2d 67 (1991); *United States v. Meitinger*, 901 F.2d 27, 29 (4th Cir.), *cert. denied*, 498 U.S. 985, 111 S.Ct. 519, 112 L.Ed.2d 531 (1990).

The 1993 amendments to the asterisk note to Guidelines § 2D1.1(c), and to that section's Commentary, would not compel a differing result in the above cases. The Sentencing Commission expressly restricted the pertinent 1993 revisions to the unique case of LSD in recognition of the widely disparate weights of the typical carrier mediums for that hallucinogen. Moreover, the Commission did not eliminate the *entire* weight of carrier mediums in LSD sentencing cases; rather, it standardized the quantification of LSD carrier medium doses at 0.4 milligrams each, which includes allowance of *some* carrier medium weight. The Commission, in both the asterisk note to § 2D1.1 and the Commentary to that section, as amended in 1993, recognized that in circumstances involving drugs other than LSD the entire weight of the mixture of narcotics and carrier medium must be included in the sentencing determination.[10] Because the user ingests the mix-

---

10. The final two paragraphs of the "Background" section of the Commentary to § 2D1.1(c) (Nov. 1, 1993) recite in relevant portion:

Because the weights of LSD carrier media vary widely and typically far exceed the weight of the controlled substance itself, the Commission has determined that basing offense levels on the entire weight of the LSD and carrier medium would produce unwarranted disparity among offenses involving the same quantity of actual LSD (but different carrier weights), as well as sentences disproportionate to those for other, more dangerous controlled substances,

such as PCP. Consequently, in cases involving LSD contained in a carrier medium, the Commission has established a weight per dose of 0.4 milligram for purposes of determining the base offense level.

The dosage weight of LSD selected exceeds the Drug Enforcement Administration's standard dosage unit for LSD of 0.05 milligram (*i.e.*, the quantity of actual LSD per dose) in order to assign some weight to the carrier medium. Because LSD is typically marketed and consumed orally on a carrier medium, the inclusion of some weight attributable to the carrier medium recognizes (A) that offense levels for most other controlled substances are based

ture of carrier medium and hydromorphone contained in dilaudid capsules simultaneously, and because the special rules for LSD do not apply to dilaudid, the district court's reliance upon the total weight of the tablets in computing the defendant's base offense level was proper, and indeed was mandatory. The appellant's asserted analogy to syringes and brief cases was inapposite, as these "carriers" are not ingested or chewed and are readily separable from the illegal narcotic substances transported therein.[11]   Finally, the fact that the sentencing court in Landers' 1990 conviction determined an erroneous drug quantification favorable to the defendant provided no foundation for applying the same faulty premise in the instant prosecution.

■ The appellant's fourth contention is that the trial court reversibly erred by displaying, over objection asserted via a motion in limine, sections of the clandestine videotape of the conversation between Landers, Alexander, and Jones which occurred in the motel room on April 30, 1992. In the contested segments, Landers, in the course of requesting possession of the narcotics on consignment, related that he had transacted a considerable volume of dilaudid business with Alexander during the previous two years. In response to an inquiry by Landers, Alexander declared that Landers had expended approximately one-quarter of a million dollars on drugs procured through Alexander during this period. These transactions were outside the scope of the indictment in this case. The defendant averred that this evidence of his "bad character" was admitted contrary to the dictates of Federal Rule of Evidence 404(b).

However, the court below allowed this material to be displayed to the jury *not* as Rule 404(b) evidence, but instead as statements relevant to the overall understanding of the otherwise admissible incriminating conversation, and additionally as statements made in the furtherance of the conspiracy.[12]   Immediately following the airing of the videotape, the trial judge appropriately instructed the jurors as follows:

> Ladies and gentlemen, you have heard some conversation on that tape concerning prior business dealings prior to the period of time that—and prior to the offense that is alleged in this indictment. Mr. Landers, of course, is charged only with the offense that is alleged in this indictment and not with any activity that may have occurred prior to that time. You are to consider this evidence only as it may relate to your understanding of the evidence relating to the particular offense that is charged in this case. It's offered for you [sic] assistance in understanding the conversation but not for any purpose relating to any charge other than the one that is alleged in the indictment.

The district court did not abuse its discretion by allowing this evidence to go before the jury, coupled with the above limiting charge. *See United States v. Taplin*, 954 F.2d 1256, 1258 (6th Cir.1992) (the evidentiary rulings of the trial court should not be reversed absent a clear abuse of discretion). In a situation such as that presented herein, such utterances are directly relevant to factual issues underlying the "conspiracy to possess" count to be resolved by the jury (i.e., that Landers attempted to obtain dilaudid on this occasion by relying upon the past relationship). A criminal conspirator makes or

> upon the weight of the mixture containing the controlled substance without regard to purity, and (B) the decision in *Chapman v. United States*, 500 U.S. 453, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991) (holding that the term "mixture or substance" in 21 U.S.C. § 841(b)(1) includes the carrier medium in which LSD is absorbed)....

11.   See Application Note 1 in the Commentary to § 2D1.1 (Nov. 1, 1993), which posits that a narcotic "['m]ixture or substance['] does not include materials that must be separated from the controlled substance before the controlled substance can be used."

12.   In so ruling, the district judge opined:

> It sounds to me like the jury could find that they were statements made in the course of this conspiracy, and that certainly the court could find as a preliminary matter that they were if the negotiation was about whether or not the drugs should be fronted due to the past relationship. I mean he was using the past relationship arguably to further this particular deal.
>
> \*   \*   \*   \*   \*   \*
>
> It's doubtful that there is any reasonable way to redact that portion and have the remaining conversation making any sense.

elicits such statements in the course of furthering the criminal enterprise at his or her own peril.

Finally, the appellant attacked the revocation of his supervised release initially ordered in his 1990 dilaudid prosecution, and the resultant imposition of a custodial term of 15 months to be served consecutively to the 188 months imposed for the 1993 conviction, on the theory that the sentencing judge failed to recognize his discretion to depart downward. Landers claimed that the sentencing judge did not realize that he had the authority to direct a period of revoked supervised release to be served concurrently with the sentence imposed for the 1993 conviction.

■ Ordinarily, a sentence conforming to the range mandated by the guidelines cannot be appealed simply because the trial judge refused to award a downward departure. *United States v. Pickett*, 941 F.2d 411, 417–8 (6th Cir.1991). However, an appeal may be cognizable where a district judge "incorrectly believed that he lacked any authority to consider defendant's mitigating circumstances as well as the discretion to deviate from the guidelines." *United States v. Maddalena*, 893 F.2d 815, 818 (6th Cir.1989), *cert. denied*, —— U.S. ——, 112 S.Ct. 233, 116 L.Ed.2d 190 (1991). *See also U.S. v. Dellinger*, 986 F.2d 1042, 1044 (6th Cir.1993) (a district court's decision that it lacked discretion, as a matter of law, to depart downward, was subject to appellate review under 18 U.S.C. § 3742(e)(2), but no jurisdiction existed to review the district judge's discretionary refusal to depart downward); *U.S. v. Vincent*, 20 F.3d 229, 239 (6th Cir.1994) (same).

■ Guidelines § 7B1.3(f) (November 1, 1992), and Application Note 5 thereto, unequivocally directed the sentencing courts to order imprisonment resulting from the revocation of supervised release to commence following completion of any term currently being served by the defendant.[13] Nonetheless, the district courts enjoy discretion to order concurrent sentences where the guidelines recommend consecutive sentences if the circumstances warrant a departure. *United States v. Stewart*, 917 F.2d 970 (6th Cir. 1990).

In this case, the sentencing judge at the revocation hearing recognized his discretion to depart downward in appropriate circumstances but determined that no special mitigating circumstances existed herein to warrant such relief:

> I'm not certain whether I have the authority to depart from the guideline requirements that the sentence be served consecutively. *Certainly, I have the authority to depart on any guideline sentencing when the circumstances are such that a departure is warranted. But I conclude that departure is not warranted in this case* .... (emphasis supplied).

Therefore, the revocation hearing judge did *not* commit the error of law, reviewable de novo, of failing to understand that he possessed the authority to allow a downward departure in appropriate circumstances. Rather, the lower court exercised its discretion to determine that no downward departure was appropriate in this case, which exercise of discretion comported with the directives of the guidelines, and which was not reviewable by this court. Consequently, the appellant's final assignment of error must fail.

Accordingly, the judgments and sentences of the district courts below are hereby **AFFIRMED.**

---

**13.** Guidelines § 7B1.3(f) (Nov. 1, 1992) mandated:

> Any term of imprisonment imposed upon the revocation of probation or supervised release shall be ordered to be served consecutively to any sentence of imprisonment that the defendant is serving, whether or not the sentence of imprisonment being served resulted from the conduct that is the basis of the revocation of probation or supervised release.

Application Note 5 to this section instructs:

> Subsection (f) provides that any term of imprisonment imposed upon the revocation of probation or supervised release shall run consecutively to any sentence of imprisonment being served by the defendant. Similarly, it is the Commission's recommendation that any sentence of imprisonment for a criminal offense that is imposed after revocation of probation or supervised release run consecutively to any term of imprisonment imposed upon revocation.